# U.S. Agent Agreement Packet

**Please complete and sign all forms listed below and email to wfgaa@transamerica.com:**

- Agent Application
- SMD Approval
- W-9
- Agent Insurance Guide
- Agent Insurance Guide Acknowledgement Form
- Debit-Check Agent/Agency Authorization Form
- Agent Agreement and Exhibits
- Mutual Agreement to Arbitrate Claims Agreement
- Credit Card Agreement



WFG®

# World Financial Group Insurance Agency

## Agent Agreement

**This agent agreement** (herein "Agreement") is made and effective as of the date indicated on the signature page (the "Effective Date") by and between **World Financial Group Insurance Agency, LLC** and each undersigned agency (jointly and severally referred to herein as "WFG"), and the undersigned individual (hereinafter referred to as the "Agent"). WFG and Agent are collectively referred to herein as "the Parties".

**WHEREAS**, WFG is comprised of affiliated insurance agencies that provide access to Products and Services approved for offer, referral or sale by retaining the services of independent insurance agents; and,

**WHEREAS**, properly licensed independent insurance agents may apply for appointment through WFG to market the Products and Services offered by one or more Product Providers as agents may choose; and,

**WHEREAS**, Agent is a properly licensed independent insurance agent and wishes to market Products and Services through WFG, and WFG wishes to retain the services of Agent in order to market the Products and Services; and

**WHEREAS**, Agent is an independent contractor and not an employee of WFG, and this Agreement does not create an employment, agency or any other type of relationship between Agent and any of the Affiliated Companies.

**NOW, THEREFORE**, in consideration of the premises, mutual promises and covenants set forth in this Agreement, and other good and valuable consideration, including but not limited to WFG's providing to Agent a platform through which Agent can, if Agent chooses, build Agent's business and have access to Product Providers, financial services information, and Affiliated Companies, the receipt and sufficiency of which are hereby acknowledged by the Parties, and intending to be legally bound, the Parties hereby agree as follows:

**1. Definitions**

1.1 "Advance Commissions" – Any monies that may be paid by WFG to Agent for the sale of Products and Services through WFG, as an advance against Agent's commissions that are not yet Earned Commissions, as more specifically explained in the Agent Guidelines.

1.2 "Affiliated Companies" – Includes all companies controlling, controlled by or under common control with WFG.

1.3 "Agent Guidelines" – Those guidelines, policies, practices and procedures, including, but not limited to, those set forth in the WFG field policies and procedures, Commissions Policies, guides, memoranda, bulletins or alerts as may be published, promulgated, or amended from time to time by WFG, which are fully incorporated by reference into this Agreement. Any changes shall be effective as of the date of general publication. Agent is expected to and acknowledges that Agent will (or has) read the Agent Guidelines and will keep current with all changes to them.

1.4 "Assistant" – Individual in the relationship of employee, independent contractor, or other position with Agent, as Agent may choose, separate from any direct relationship, if any, with WFG or one or more Affiliated Companies, for the purpose of assisting Agent with Agent's business.

1.5 "Commissions Calculations" – Commissions are calculated pursuant to the terms of this Agreement and the Commissions Policies referred to herein. The Commissions Calculation includes any necessary adjustments, reconciliations, or off-sets made against any baseline unearned commission amount including, but not limited to, deductions for:

INITIALS ______________

(a) License and other fees;

(b) Pending Commissions and expenses that Agent is required to refund to WFG because of Customer cancellations, rights of withdrawal, non-renewals, terminations, lapses or otherwise;

(c) Debt Balances of Agent's Downline Agent(s);

(d) Reserve Balance Account deductions;

(e) Indemnified Losses owed by Agent;

(f) other claims of WFG against Agent; and

(g) any and all money or value which may be erroneously paid, advanced, or credited by, or on behalf of, WFG or Affiliated Companies, to, or for the benefit of, Agent and any money owed by Agent to WFG or Affiliated Companies.

1.6 "Commissions Policies" – Policies and schedules created by WFG that govern how Agents' commissions are calculated by WFG for the referral or sale of Products and Services, which policies are subject to change from time to time in the sole discretion of WFG and which policies are fully incorporated by reference into this Agreement.

1.7 "Compensation" – Remuneration paid, or caused to be paid, by WFG pursuant to this Agreement, Agent Guidelines and/or any selling agreements between WFG and Product Providers in the form of Earned Commissions, Referral fees, cash, Points, values of trips, rings, Visa cards, watches or any other form of compensation that WFG may provide from time to time, and as more specifically defined and explained in Section 3 of this Agreement.

1.8 "Confidential Information" – Any and all Personally Identifiable Information or confidential and proprietary records, data or information created by or on behalf of, or belonging to, WFG and now or hereafter acquired by, made known or disclosed to the Agent or any Assistant which has value to, and is not generally known by, competitors or potential competitors of WFG, and includes but is not limited to hierarchy lists and Personally Identifiable Information deemed to be confidential by applicable federal, state, commonwealth and/or local laws and list(s) of WFG agents, including their identities and contact information. Confidential information does not include information which becomes generally available to the public other than as a result of disclosure by the Agent, any Assistant or any member of WFG's network of contractually affiliated agents.

1.9 "Customer" – Any person or entity to whom any WFG agent solicits or attempts to solicit for Products and Services pursuant to the agent's contractual relationship with WFG.

1.10 "Debit Balance" – The balance remaining from time to time after completing the Commissions Calculation under which Agent's Pending Commissions exceed Agent's Earned Commissions.

1.11 "Divestiture" – The ceasing of Agent's entitlement to continuing Compensation from or through WFG.

1.12 "Downline Agent" – Any agent of WFG who is a member of Agent's Hierarchy and who was: (a) recruited by Agent; (b) an agent recruited by any agent within Agent's downward Hierarchy; or (c) transferred into Agent's downward Hierarchy.

1.13 "Earned Commissions" – Has the meaning set out in Section 3.2.

1.14 "Georgia Courts" – The United States District Court for the Northern District of Georgia, and the Superior and State Courts of Fulton County, Georgia.

1.15 "Hierarchy" – The then current roster of agents reflected on WFG's internal database(s) as part of Agent's complete sales organization.

**INITIALS** ____________

1.16 "Hierarchy Level" – The position obtained by an agent consistent with WFG's Agent Guidelines criteria and in relation to other agents.

1.17 "Indemnified Losses" – Any and all liability, claims, demands, proceedings, obligations, assessments, losses, costs, damages, and expenses, of any nature whatsoever, contingent or otherwise, including, without limitation, any and all judgments, decrees, equitable relief, extraordinary relief, settlements, awards, E&O deductibles, attorney's fees, court costs, punitive damages and arbitration costs including arbitrators' fees against an Indemnified Party.

1.18 "Indemnified Party" – WFG, the Affiliated Companies and the respective officers, directors and employees of each such entity.

1.19 "Override Compensation" – Those monies that are paid to an agent from the referral or sale of Products and Services made by other WFG agents in accordance with Agent Guidelines.

1.20 "Pending Commissions" – Any monies that may be paid by WFG to Agent, including Advance Commissions and Override Compensation, for the sale or referral of Products and Services through WFG which shall not become Earned Commissions until the Commissions Calculation is complete, as more specifically defined and explained in this Agreement and the Commissions Policies.

1.21 "Personally Identifiable Information" ("PII") – An individual's first name or initial and last name plus: (a) social security number; (b) driver's license number or government-issued identification card number; (c) financial account, credit or debit card number with or without any required security code or personal identification number (PIN) that would permit access to a financial account; or (d) medical information.

1.22 "Points" – Value accumulated and used to achieve travel and other rewards provided by WFG to agents based on the amount of commissions earned by agents.

1.23 "Product Providers" – One or more affiliated or unaffiliated companies with which WFG has established, or may from time to time establish, contractual relationships to refer, offer or sell Products and Services.

1.24 "Products and Services" – Those products and services of Product Providers that are approved by WFG for offer, referral or sale by agents as listed on the WFG's intranet site, and as may be updated by WFG from time to time with or without notice to agents.

1.25 "Referral" – The circumstance in which a WFG agent refers an individual to a Product Provider, but in which circumstance the agent does not actually offer a contract to sell or sell the Products and Services to the individual.

1.26 "Renewal" – The process required by Agent to continue as an agent with WFG as described in the Agent Guidelines.

1.27 "Reserve Balance Account" – An account established for Agent by WFG from a percentage of Agent's Pending Commissions set aside to pay off any outstanding Debt Balance at the time of Agent's termination from WFG. The percentage amount of Agent's Pending Commissions to be set aside is calculated in accordance with the Agent Guidelines.

1.28 "Roll Up" – The transfer, with recourse, of the Debt Balance of a Downline Agent to that Downline Agent's Upline Agents, as are more specifically set out in the Agent Guidelines.

1.29 "Trade Secret" – Any and all information, knowledge or data in any form whatsoever, tangible or intangible, which is considered a trade secret under applicable law.

1.30 "Upline Agent" – Any agent of WFG who is a member of Agent's Hierarchy and who: (a) recruited Agent; (b) recruited the agent who recruited Agent; or (c) is in Agent's upward Hierarchy.

**INITIALS** ____________

1.31 "Vested" – The right of Agent to receive after termination of Agent's contractual relationship with WFG, such Earned Commissions due based on sales made prior to termination, as permitted by law or the Agent Guidelines unless and until Divestiture occurs.

**2. Agent's Representations, Warranties and Obligations**

Agent hereby understands, agrees, represents, warrants and acknowledges that:

2.1 Agent is of the legal age of majority in the state or commonwealth in which Agent resides on the date that Agent signs this Agreement and is otherwise competent to enter into this Agreement, and has the authority to enter into this Agreement and that, by virtue of entering into this Agreement and consummating the transactions contemplated hereby, or otherwise, Agent is not, and will not, be in breach of, violate, or interfere with, any other contract, agreement, business relationship or obligation which Agent has with any third party, company, agency, association, firm, person, corporation, or other entity.

2.2 Agent hereby confirms that Agent is eligible to work lawfully in the United States. To the extent that Agent is eligible to work lawfully in the United States pursuant to a work permit with hours of work limitations or restrictions (including, without limitation, pursuant to a student work permit), Agent covenants that Agent will not exceed such hour limitations or restrictions in performing services hereunder. Agent shall hold harmless and indemnify WFG, its affiliates and their respective directors, officers, employees and agents for any damages or losses (including penalties, interest and legal fees) arising from or relating to Agent's breach of the covenant in this Section.

2.3 Agent has not engaged, and will not engage, in any business, practice or behavior or take any action which has resulted, or will result, in any violation of any restriction or covenant to which Agent is subject pursuant to any agreement.

2.4 Agent shall comply with all applicable anti-money laundering laws, rules, regulations and government guidance, including any reporting, recordkeeping or compliance requirements. These include requirements to identify and report currency transactions and suspicious activity, to verify customer identity and to conduct customer due diligence. In addition to applicable laws, WFG and each Product Provider has implemented an anti-money laundering program which includes requirements for reporting suspicious activity and requires insurance agents to complete anti-money laundering training. Agent agrees to comply with WFG's and each Product Provider's anti-money laundering policies and reporting and training requirements.

2.5 Agent shall comply with all anti-corruption laws and will not make any bribes or engage in any other unlawful or improper methods of remuneration to any person. Agent also agrees to immediately report to WFG any violations of the anti-corruption laws or suspicions that improper conduct was engaged to obtain business and understands that WFG prohibits retaliation in any form against any Agent who has, in good faith, raised or reported such a violation or conduct.

2.6 Agent agrees that by signing this Agreement that Agent is certifying compliance with WFG's GLBA and HIPAA Business Associate Provisions and Data Protection Framework, both attached hereto as Exhibit A and Exhibit B, respectively, and incorporated by reference herein. Such Exhibits may be amended from time to time by WFG without the notice required in Section 6.3. Agent further acknowledges Agent's understanding and agreement to the separate, standalone Mutual Agreement to Arbitrate Claims Agreement that follows this Agreement.

2.7 It is understood that in agreeing to provide services as an agent under this Agreement, Agent shall be acting and shall always act as an independent contractor and not as an employee of WFG or its Affiliated Companies for any purpose whatsoever, including without limitation, for purposes relating to taxes, payments required by statute or any other withholdings or remittances to any governmental agency or authority. Neither this Agreement, the relationship created between the Parties pursuant to this Agreement, nor any course of dealing between the Parties is intended to create, or shall create an employment relationship, a joint venture, partnership or any similar relationship. Agent does not have authority to bind WFG in any contractual obligation outside of the authority described in this Agreement. Agent shall conduct and control Agent's business activities, including but not limited to, schedule, work hours, customer prospects, office location, geographic area, Assistant and administrative support (if any), expenses, and business strategies and methods, subject to all applicable

**INITIALS** ____________

local, state, commonwealth and federal laws and regulations, this Agreement, and any other contract(s) between the Agent and WFG. So far as it is not inconsistent or in conflict with the terms of this Agreement, Agent is free to engage in any other remunerative contract, calling or occupation during the duration of this Agreement.

2.8 The Parties shall operate their respective businesses separately and independently of each other throughout the duration of this Agreement, subject to required insurance industry regulatory oversight from WFG.

2.9 None of the benefits, if any, that WFG provides to its employees, shall be available to Agent (or Agent's employees or Assistants, if any). For the purpose of this Agreement, benefits mean, without limitation, any employee benefit, pension, profit sharing, savings, retirement, deferred compensation, stock option, phantom stock, restricted stock, or stock purchase, insurance, health, dental, disability, employee welfare benefit, sick pay, workers' compensation coverage, bonus, vacation pay, severance pay, and any other similar plans, programs and agreements, whether or not reduced to writing. Agent also agrees that, if applicable, it is the sole responsibility of Agent to purchase workers' compensation insurance or file any required Notice of Designation as Independent Contractor or similar paperwork with the appropriate state, or commonwealth and/or local agency.

2.10 The Agent shall procure and maintain all insurance coverage and permits of work of every nature and kind required by federal, state, commonwealth and/or local laws (including, without limitation, applicable workers' compensation coverage) and Agent shall have no recourse against WFG or its Affiliated Companies for any losses, damages, claims, costs, or expenses in relation to any occurrence connected with the services provided under this Agreement or the Agent's delivery of the services. At WFG's request, the Agent may be required to produce to WFG a clearance certificate or other documentation demonstrating that Agent has adequate workplace safety insurance compensation and other insurance coverage.

2.11 Agent shall have the right to select and engage Assistants to assist in the accomplishment of the work for which Agent engages in pursuant to this Agreement. Agent is solely responsible for paying all compensation owed to any Assistant and for paying, and/or withholding and remitting to the appropriate government agency(ies), any applicable taxes that might be owed with respect to such compensation. Agent shall be responsible for the activities of any such Assistants the same as if the activity was performed or conducted by Agent directly, including, but not limited to, any Assistant's protection or use of Confidential Information or Trade Secret.

2.12 Agent authorizes and acknowledges that all Compensation owed to Agent as a result of business written or referred by Agent shall be paid to Agent by WFG, and that Product Providers have no obligation to Agent for Compensation on such business. All amounts earned in connection with the business written or referred by Agent while this Agreement is in effect shall be paid by Product Providers to WFG as long as the contracts or policies remain in force and subject to commission payments and WFG will pay Compensation to Agent in accordance with this Agreement.

2.13 The Compensation paid to Agent from the sale or referral of Products and Services is compensation for:

(a) the Agent's sale or referral, or his/her Downline Agent's sale or referral of Products and Services; and,

(b) the Agent's agreement herein not to breach the terms of this Agreement.

2.14 While this Agreement is in force, Agent shall:

(a) have and maintain appropriate insurance licenses and appointments, as required, applicable to the business Agent conducts under this Agreement;

(b) not have any affiliation, other than as a customer, with a WFG Product Provider outside of his/her relationship with WFG for the sale of any new insurance business unless such affiliation is for receipt of vested or deferred commissions, earns, trails and/or renewals only, and such affiliation has been disclosed to WFG in writing;

(c) not be obligated to contract with WFG exclusively, and this Agreement does not give Agent exclusive rights in any area; and

**INITIALS** ____________

(d) take reasonable actions to monitor and supervise the recruiting and selling activities of their Downline Agents and to ensure that their Downline Agents are following the terms of the Agent Guidelines.

2.15 Except as prohibited by law, during the period that Agent is an Agent of WFG and for a period of two (2) years following the termination of this Agreement for any reason, Agent shall not, either individually or in partnership or jointly or in conjunction with any other person or entity, as principal, agent, consultant, contractor, employer, employee or in any other manner, directly or indirectly, solicit, induce or entice away or in any other manner persuade or attempt to persuade any individual who is a current agent of WFG and with whom the Agent had business contact with on behalf of WFG or its affiliated or related entities, to terminate or alter their agent relationship with WFG to join a competing organization. This non-recruitment restriction is limited and only applies with respect to any recruitment of an agent that resided in or engaged in business activities in the geographic area within fifty (50) miles of the location of the Agent's office(s) during the eighteen (18) month period preceding the recruitment. This provision survives the termination of this Agreement.

2.16 Agent will not use, disseminate or reveal, other than on behalf of WFG as authorized by WFG or the Product Providers, any Confidential Information or Trade Secret of WFG or of the Product Providers, which Agent has or hereafter receives. Agent agrees that immediately upon the termination of this Agreement, Agent will return all documents, files and lists containing any Confidential Information or Trade Secret to WFG and the same shall not be copied or duplicated.

2.17 Agent shall not do anything that will damage the business, good name or reputation of WFG, Affiliated Companies and/or their respective officers, directors, and employees.

2.18 Agent shall not, in connection with any personal entity or activity, joint venture, partnership or corporation, appropriate or use WFG's or Affiliated Companies' service mark(s) or trademark(s), name(s) or any phrase, designation, or label, including the terms "WFG", "WFGIA", "World Financial Group", "World Financial Group Insurance Agency", "TFA", "Transamerica", "Aegon" or other similar designations or derivatives whether separately, or in conjunction with any notation indicative of a business organization.

2.19 Agent shall comply with all the terms and conditions of this Agreement and any other contract(s) with WFG, the Agent Guidelines and all policies, practices and procedures adopted by WFG that are mandated by law, regulation, administrative bulletin or FAQ, or binding industry requirement, specifically including insurance and data protection requirements. In addition, Agent shall take reasonable steps to ensure that any Assistant also complies with such Agreement, Agent Guidelines, and all other such policies, practices and procedures adopted by WFG while assisting with Agent's duties governed by this Agreement.

2.20 Except as prohibited by law, the following terms shall apply: Agent shall promptly pay, including through offsets against Pending Commissions, all expenses relating to this Agreement, including but not limited to indebtedness to WFG or Affiliated Companies. Agent shall also be obligated to repay WFG for the Debt Balances of any of Agent's Downline Agents (Roll Up). Agent shall also pay WFG's technology fees related to systems and technology provided by WFG according to the Agent Guidelines. The Agent hereby acknowledges that any required fees relating to such services may be changed by WFG without prior notice. Agent hereby authorizes WFG to apply offsets against Agent's Pending Commissions for payment of Agent's expenses for systems and technology provided through WFG if not paid otherwise.

2.21 Agent shall participate in WFG's established program for errors and omissions and fidelity insurance coverage. In limited circumstances where state law may impose certain restrictions on corporate coverage of E&O insurance, the Agent may be required to secure Agent's own E&O policy and submit proof of such insurance.

2.22 Agent shall be responsible for providing Agent's own office, telephone, furniture, equipment, supplies, transportation, and such other facilities as Agent in his/her discretion, may deem necessary or appropriate, and Agent shall be solely responsible for all expenses incurred by Agent, including but not limited to training, travel, entertainment, office, signs, telephone, education, dues, subscriptions, insurance licenses, business licenses, taxes, and Assistants, if any, and Assistants' expenses, taxes, etc. Agent acknowledges that Agent shall receive no remuneration or reimbursement of any nature whatsoever for such expenses.

**INITIALS** ____________

2.23 Agent shall be responsible for ensuring the accuracy of any records, calculations, or correspondence that Agent receives from WFG. If Agent identifies any error or inaccuracy in any such record, calculations, or correspondence, Agent shall notify WFG of such error or inaccuracy in writing within thirty (30) days of receipt of records, calculations, and correspondence. If Agent does not provide written notice to WFG within thirty (30) days of receipt of any records, calculations, or correspondence such record, calculation, or correspondence shall be deemed to be accurate and be binding upon Agent, and WFG shall be released from liability or responsibility for any and all matters contained therein. Notwithstanding the foregoing, if WFG identifies any error or inaccuracy in any record, calculation, or correspondence provided to Agent, it may correct such error or inaccuracy at any time.

2.24 Agent agrees that any and all "Personally Identifiable Information" or "PII" collected, accessed, stored, or transmitted by Agent or Agent's Assistants (included in "Agent" in this Section 2.24 only), if any, on behalf of, or from WFG and/or Product Providers in connection with the performance of Agent's services under this Agreement shall be used only as necessary to perform Agent services under this Agreement. Agent shall not collect, access, store, transmit or otherwise disclose PII for any other purpose, or to any person other than WFG, Product Providers, or the individual who is the subject of the PII unless specifically authorized in writing by WFG, Product Providers, or the individual who is the subject of the PII, or as otherwise permitted by law. Agent agrees to establish physical, electronic, and administrative procedures to protect the security and confidentiality of PII in accordance with the Agent Guidelines and privacy laws. This Section 2.24 survives the termination of this Agreement.

2.25 Agent shall comply with the terms, conditions and restrictions as conveyed through training, information made available from third-party providers and general industry standards with respect to the use of any WFG licensed computer software. Agent further agrees to comply with the terms of any license or other contractual agreement into which Agent is required to enter with any such third-party software owner.

2.26 In connection with any payment or amount that WFG or the Product Providers may refund to any Customer, WFG shall be authorized to deduct the amount of any previously received Compensation related to such transaction from any Pending Commissions due Agent, consistent with applicable law.

2.27 Agent shall repay all Debt Balances upon demand by WFG, and Agent expressly agrees to do so. Any Debt Balances not paid within thirty (30) days from the date of such demand shall bear interest from the end of such thirty (30) days at a rate equal to 11% per annum or otherwise as indicated in the Agent Guidelines, and such interest shall be added to the Debt Balance. Debt Balance will be offset against future Pending Commissions until fully recouped. If this Agreement is terminated in accordance with Section 4 by WFG or Agent for any reason, and Agent's outstanding Debt Balance exceeds the amount of Pending Commissions owed, if any, as of termination, Agent must repay WFG the outstanding Debt Balance. WFG shall maintain the right to exercise any and all legal rights and remedies available to it to collect outstanding Debt Balances, including but not limited to, referring such Debt Balances to a collection agency and/or arbitration. Agent understands and authorizes that a certain percentage of Agent's Pending Commissions, as detailed in the Agent Guidelines, will be set aside to establish and fund a Reserve Balance Account to be used to pay off any future outstanding Debt Balance at the time of Agent's termination from WFG.

2.28 By entering into this Agreement with, or otherwise becoming an independent contractor of WFG, Agent expressly consents to being contacted by WFG and its agents, representatives, and third party service providers via telephone, fax, email, mail, text message or other reasonable means, at any of Agent's contact numbers, addresses, or email addresses, regardless of whether Agent is listed on any federal, state, commonwealth, provincial or other applicable "Do Not Call" list, with regards to the enforcement of any of the terms and conditions under this Agreement or for other purposes reasonably related to the relationship formed under this Agreement with WFG. This provision survives termination of this Agreement.

2.29 Agent shall cooperate fully and provide assistance to WFG in the investigation and resolution of any complaints, claims, actions or proceedings that may be brought by or that may involve Agent or Agent's hierarchy or WFG.

2.30 Agent shall not:

**INITIALS** ____________

(a) take or perform any act or action, or make any representation purporting to create any obligation or liability on the part of WFG, its Affiliated Companies, or any of their respective officers, directors and employees, or bind WFG, its Affiliated Companies, or any of their respective officers, directors and employees to any other legal obligation including but not limited to, any contract or agreement with any third party except as otherwise authorized in this Agreement;

(b) collect cash or checks from Customers in payment for the purchase of Products and Services payable to any person other than a party designated by the appropriate Product Provider;

(c) (i) represent a product or service that is not a Product and Service under this Agreement as being approved by and offered for sale through WFG; (ii) sell, refer or offer to sell any products or service through WFG that is not a Product or Service under this Agreement; or (iii) make any misrepresentation to a Customer, in connection with a referral, or purchase of, or improperly induce any Customer to purchase Products and Services. Agent shall indemnify WFG and hold any Indemnified Party harmless, consistent with Section 5 of this Agreement, for Agent's breach of this paragraph.

2.31 Upon termination or request, Agent shall return all WFG property, which Agent acknowledges includes all Customer and other files in the Agent's possession.

**3. Agent's Compensation**

3.1 Agent acknowledges and understands that Agent is compensated under this Agreement only from the sale or referral of the Products and Services offered through WFG by Agent or Agent's Downline Agents. The Agent's sole compensation under, and during the term of, this Agreement shall be that Compensation paid, or caused to be paid, by WFG pursuant to this Agreement, Agent Guidelines and/or any selling agreements between WFG and Product Providers. There is no guarantee that the Agent will be financially rewarded solely by virtue of becoming an Agent of WFG or by attempting to build his or her own business. Except as set forth in this Agreement and/or Agent Guidelines, Agent shall not receive any other compensation or benefit of any kind whatsoever, including but not limited to insurance benefits, workers' compensation benefits, unemployment insurance benefits, disability income, paid sick leave, paid vacation, expense reimbursement or retirement benefits from WFG under this Agreement and/or Agent Guidelines.

3.2 Commission is not considered "earned" by Agent and due and payable by WFG under this Agreement ("Earned Commission") unless and until:

(a) Agent has a valid license and active Agreement with WFG at the time of payout or otherwise Vested, as set forth in this Agreement;

(b) WFG has received payment from Product Providers on commissionable sales or Referrals;

(c) all requirements set forth in this Agreement are satisfied; and

(d) the Commissions Calculation is finalized.

The Commissions Calculation is not finalized until all calculations set forth herein and in the Agent Guidelines are completed and any necessary adjustments and/or offsets are made as set forth in this Agreement and the Agent Guidelines.

3.3 Subject to applicable law, any money, fees or Points owed by Agent to WFG, actual or contingent Debt Balance, and any money or Points which have been advanced or credited by or on behalf of WFG or the Product Providers, for the benefit of Agent, may be offset and deducted by WFG from any Pending Commission payment. Agent agrees and acknowledges that any obligation to repay Debt Balances or any other amounts including those owed to WFG and paid to and through, or offset against, Pending Commissions by WFG arises from a commercial transaction and is of a business nature.

3.4 Agent authorizes Affiliated Companies to pay directly to WFG any Pending Commissions or other Compensation which are otherwise payable to Agent by such Affiliate Companies in order to satisfy any obligation or liability of Agent to WFG,

**INITIALS** ____________

or to compensate WFG for any damages, losses, costs and expenses which WFG may sustain or be liable for, by reason of any act or failure to act on the part of Agent. Agent authorizes WFG to pay directly to any Affiliated Companies any Pending Commissions or other Compensation which are otherwise payable to Agent by WFG in order to satisfy any obligation or liability of Agent to such Affiliated Companies or to compensate Affiliated Companies for any damages, losses, costs and expenses which Affiliated Companies may sustain or be liable for by reason of any act or failure to act on the part of Agent.

3.5 Except as otherwise provided in this Agreement, and subject to the terms of this Section, if and when Agent qualifies for, and attains, certain Hierarchy Level designations established by WFG from time to time pursuant to the Agent Guidelines , Agent shall become Vested and entitled to continue receiving Earned Commissions after termination from WFG, subject to all applicable laws and regulations, including but not limited to, the rules of any regulatory or self-regulatory organizations with jurisdiction over WFG. If Agent becomes Vested, then, in the event that this Agreement terminates due to Agent's death, WFG shall pay the Commissions to Agent's estate or, Agent's beneficiary as designated in writing by Agent's estate representative at time of death. Agent shall, upon becoming Vested, be Vested only to the extent that WFG receives payment(s) from Product Providers, the commissions are Earned Commissions as set forth herein, and Agent can legally receive such amounts. In the event that Agent, at the time of termination of this Agreement, has not qualified and attained the sales position designation(s) established by WFG as a condition to becoming Vested, Agent shall have no right to any Pending Commissions, Earned Commissions, or other Compensation of any kind from WFG after termination.

3.6 Notwithstanding anything in this Agreement to the contrary, if Agent is Vested but Agent's termination from WFG is a "Cause" termination in accordance with Section 4.3, Divestiture may occur in WFG's sole discretion and Agent forfeits any right to receive Earned Commissions post-termination, unless such Divestiture is prohibited by applicable law. Additionally, even if Agent's termination from WFG is not a "Cause" termination in accordance with Section 4, should Agent subsequently violate or fail to comply with any promise, obligation, covenant, warranty or representation contained in this Agreement which survive the termination of this Agreement, such violation or failure could result in Divestiture, as described in this Section, unless such Divestiture is prohibited by applicable law.

3.7 As an independent contractor, Agent shall be responsible for paying any and all federal, state, commonwealth, local or other taxes and related amounts that may become payable with respect to any Compensation Agent may receive under the terms of this Agreement including without limitation, to Federal Insurance Contributions Act ("FICA"), the Social Security Act, the Federal Unemployment Tax Act ("FUTA"), federal income tax withholding requirements, State Personal Income Tax Withholding ("PIT"), State Unemployment taxes ("UI"), State Disability Insurance ("SDI"), and all other federal, state, commonwealth, and local laws, rules and regulations. Agent shall be treated as an independent contractor with respect to WFG. Agent represents that Agent will file all required tax returns, tax declarations, and tax schedules. Agent acknowledges and agrees that WFG will not withhold any taxes from Compensation it pays Agent, except as is otherwise required by law. WFG will report all Compensation paid to Agent via the applicable tax form(s) and Agent acknowledges and agrees that WFG shall issue such form(s) to Agent that includes Compensation paid by WFG.

**4. Term and Termination**

4.1 This Agreement shall take effect on the Effective Date and shall renew upon Renewal by Agent unless otherwise terminated in accordance with this Section 4.

4.2 This Agreement may be terminated by either Party at any time and for any reason upon thirty (30) days written notice to the other party. Notwithstanding the notice provisions of Section 6.3, Agent may also provide such termination notice to WFG pursuant to the Agent Guidelines.

4.3 This Agreement shall terminate immediately without advance notice, pay in lieu of notice, damages or compensation of any kind:

(a) on the death of Agent; or

(b) where WFG determines in its sole discretion that it has cause for termination with the possibility of divestiture ("Cause"), which shall include the occurrence of any of the following events:

**INITIALS** ____________

(i) Agent's insurance license is terminated, denied or not renewed for any reason;

(ii) Agent is indicted with, subject to trial for or convicted of any crime;

(iii) Disciplinary action is taken against Agent by any state, commonwealth, province or federal regulatory agency or body with jurisdiction over Agent, WFG, Affiliated Companies and/or Product Providers;

(iv) Agent becomes temporarily or permanently enjoined, censured, suspended, disciplined or otherwise prohibited from:

(1) acting as an Agent of WFG, Affiliated Companies or Product Providers;

(2) conducting his/her business or performing any of his/her services under this Agreement; or,

(3) acting in any capacity in the insurance or financial services business that WFG considers, in its sole discretion, relevant to Agent's performance of Agent's duties under this Agreement;

(v) Termination for any reason of Agent's agreement(s) by any Product Provider or Affiliated Companies, and Agent expressly acknowledges and agrees that WFG may rely on Product Providers' or Affiliated Companies' determinations and representations regarding the reason(s) for the termination of Agent;

(vi) Agent's misappropriation or commingling of Customer payments or funds for any Products and Services;

(vii) Agent engages in a fraudulent act;

(viii) Agent misrepresents the characteristics or benefits of any of the Products and Services;

(ix) Any interference with the collection of renewal premiums;

(x) Agent violates any law, rule or regulation that governs the conduct of any part of Agent's business;

(xi) Agent breaches any provision of, or fails to perform or observe any obligation under, this Agreement or any other agreement that the Agent may have, now or hereafter, with WFG, including without limitation failing to repay Debt Balances or comply with any other monetary obligation owed by Agent to WFG in a timely manner;

(xii) Agent engages in any activity which, in the sole opinion of WFG, may adversely affect the good name and reputation of WFG or Affiliated Companies;

(xiii) Agent engages in any activity which, in the sole opinion of WFG, may be detrimental of the business interests of WFG or Affiliated Companies;

(xiv) Agent fails to comply with a material aspect of the Agent Guidelines as determined by WFG;

(xv) Agent is determined to have made any false or incorrect statement(s) in an application to a regulatory authority or WFG; or

(xvi) Failure to meet and maintain the background criteria set by WFG and/or the Product Providers.

4.4 At WFG's discretion to enforce its Agent Guidelines, instead of immediately terminating this Agreement, WFG may impose suspension of Agent's benefits and rights and privileges, including suspension of rights to solicit for purchase, referral or sale, or solicit Customers for, Products and Services and suspension and loss of Compensation, and may impose other disciplinary action, including the assessing of fines, without liability to Agent for loss or otherwise. Suspension or disciplinary action shall not in any way preclude or diminish WFG's right to terminate this Agreement at any time.

**INITIALS** ____________

4.5 In the event of termination of this Agreement by either Party, WFG shall be entitled to notify the Product Providers and any regulatory body of such termination. Agent acknowledges and agrees that WFG shall not have any liability for any loss, damage or otherwise resulting from termination by the Product Providers based on such notice.

4.6 Upon the termination of this Agreement, all Compensation due Agent as of the effective date of termination shall be paid to Agent in accordance with WFG's Agent Guidelines. Other than Earned Commissions to which Agent may be entitled if Agent is Vested, no further Compensation shall be payable to Agent after termination. Divestiture in a "Cause" termination is at the discretion of WFG. Any remaining balance in Agent's Reserve Balance Account will be used to pay down any outstanding Debt Balance and, any balance remaining after Agent's termination from WFG will be released and paid to Agent according to the Agent Guidelines.

4.7 The terms and provisions of any paragraphs or sections of this Agreement which expressly state, or by their terms require, that they survive termination of this Agreement, shall so survive the termination of this Agreement.

**5. Agent's Promise to Indemnify and Assign**

5.1 Agent agrees to defend, indemnify and hold harmless any Indemnified Party with respect to any demand or claim related in any way to any failure to declare, collect, remit and/or pay on a timely basis all required taxes and related amounts.

5.2 Agent further agrees to indemnify and hold any Indemnified Party harmless, from and against, any and all Indemnified Losses (the "Claims") incurred, sustained, suffered, or assessed against the Indemnified Party because of, arising out of, or as a result of, any act(s) or omission(s) of Agent, Agent's Assistants, if any, or any of Agent's Downline Agents, including but not limited to a breach of this Agreement, or any breach of contract(s) with the Product Providers, including but not limited to a misrepresentation involving whether Agent is authorized to act on behalf of an Indemnified Party or Product Providers or a misrepresentation involving the offer, referral or sale of Products and Services. In defending or otherwise addressing any such Claims, the Indemnified Party shall be entitled to use counsel of its own choosing and determine the validity of the Claims. The Indemnified Party shall not be required to notify the Agent of the existence or the progress of the defense of any such Claims as condition precedent to requiring payment by the Agent of the Indemnified Losses.

5.3 To secure the Agent's promise of indemnification and the Agent's obligation to repay any outstanding Debt Balance owed to WFG, Agent hereby assigns and grants to the appropriate Indemnified Party(ies) a continuing security interest in all Pending Commissions payable to Agent from WFG to the extent necessary to satisfy any Indemnified Losses or Debt Balance obligation of Agent. Agent agrees to execute such additional instruments or documents as may be necessary from time to time to perfect such security interest. This assignment is given to WFG to secure the Agent's obligations as set forth in this Agreement. Agent expressly authorizes WFG to withhold Pending Commissions in connection with any indemnity obligation of the Agent owing to WFG.

**6. Miscellaneous**

6.1 WFG shall have the right to amend this Agreement at any time by giving written notice, effective upon a minimum of 45 days advanced notice. Notwithstanding Section 6.3(c), notice under this Section can be provided by the posting of the amendment to the WFG intranet site. Agent's continued affiliation with WFG after receipt of notice of any such modification shall constitute Agent's agreement to any such modification.

6.2 WFG may, from time to time, with or without notice, increase or decrease the rates and amounts of Commissions of agents, including Agent; provided, however, that any such changes may only be applied prospectively, and any such changes may affect only Commissions paid on any new business or subsequent payments on existing business.

6.3 All notices or demands hereunder shall be sent addressed as follows:

(a) if to WFG, to the attention of President, World Financial Group Insurance Agency, LLC at WFG's then principal home office address, with a separately delivered copy to General Counsel, Transamerica Legal Department, 6400 C Street SW,

**INITIALS** ____________

Cedar Rapids, Iowa 52499 sent by certified mail, return receipt requested, postage and certified fees prepaid, or by overnight courier service;

(b) if to an officer, director or employee of WFG, then addressed to that person c/o World Financial Group Insurance Agency, LLC, at WFG's then principal home office address, with a separately delivered copy to General Counsel, Transamerica Legal Department, 6400 C Street SW, Cedar Rapids, Iowa 52499 sent by certified mail, return receipt requested, postage and certified fees prepaid, or by overnight courier services; and,

(c) if to the Agent, addressed to Agent at such Agent's home address or email address as reflected on WFG's business records sent by electronic email or overnight courier service. Agent shall immediately notify WFG of any change in the Agent's home and/or email address.

6.4 This Agreement is not a franchise agreement and does not create a franchise relationship between WFG and Agent. If any section of this Agreement is deemed to create a franchise between the Parties, then those provisions shall be deemed void and unenforceable and shall not impact the validity of any other provision(s) of this Agreement.

6.5 The failure or delay by any Party to insist upon strict performance of the terms and conditions of this Agreement shall not be deemed a waiver of any subsequent breach or default in the terms hereof. Any waiver must be in writing and signed by the Party granting the waiver. Any waiver granted by WFG must be signed by an officer of WFG.

6.6 Titles and headings of sections and subsections of this Agreement are for convenience and are not intended to encompass all of the provisions therein or to interpret such provisions.

6.7 If any part, section, clause, paragraph, term or provision of this Agreement shall be found to be void or unenforceable, such finding shall have no effect upon any other part, section, clause, paragraph, term or provision of this Agreement.

6.8 Agent may not assign any rights or obligations or delegate any services under this Agreement except as expressly provided herein, as expressly provided in the Agent Guidelines, or as otherwise authorized in writing by WFG prior to such assignment or delegation. WFG may assign any or all of its rights and obligations under this Agreement to any of the Affiliated Companies or other party; and Agent hereby consents and agrees to such assignment. Agent further agrees that, after any such assignment, WFG shall be released from all obligations and liabilities so assigned.

6.9 This Agreement (including all Exhibits) constitutes the entire agreement and understanding between the Parties hereto, unless another agreement is executed by the Parties simultaneously with or subsequent to this Agreement which makes specific reference to this Agreement and expressly supplements or modifies this Agreement. No attempted amendment of this Agreement shall be binding upon WFG unless agreed to in writing by an officer of WFG.

6.10 While certain business activities of the Agent may occur outside of Georgia, the Parties acknowledge that significant aspects of performance of this Agreement will occur in the State of Georgia, and that the provisions of this Agreement will be governed and construed under the laws of the State of Georgia. If conflict or choice of law rules would result in the application of the law of another jurisdiction, each Party voluntarily waives such rules and agrees that the substantive law of Georgia shall nonetheless govern. Agent and WFG, without waiving their rights or relieving them of their obligations to arbitrate claims set forth in the separate, standalone Mutual Agreement to Arbitrate Claims Agreement, voluntarily consent to the jurisdiction and venue of the Georgia Courts with respect to any such dispute or litigation. But if Agent primarily resides and operates business in California, Agent may opt-out of this provision by submitting a written statement in accordance with Section 6.3. In order to be effective, the opt-out notice must be submitted within 30 days of receipt of this Agreement. Agent must retain proof of timely submitting the opt-out notice. Agent acknowledges the right to consult with an attorney for advice concerning this provision. Agent further acknowledges the opt-out notice does not impact the obligations to arbitrate claims set forth in the separate, standalone Mutual Agreement to Arbitrate Claims Agreement. Agent further acknowledges this provision is not being agreed to as a condition of employment. Agent is an independent contractor and not an employee of WFG or any of the Affiliated Companies. Agent further acknowledges this Agreement is not an employment contract.

**INITIALS** ____________

6.11 In the interest of maintaining the safety and security of WFG's customers, employees and property, Agent agrees that WFG shall have the right to run such credit, employment and other financial and background investigations on the Agent at any time as WFG deems useful, whether such investigation is conducted by WFG or by an outside service or third party. The Agent shall provide any necessary consents to such investigations, and consents to the disclosure by any person or entity to WFG or its designee, of any financial, background and employment information conducted by WFG or by an outside service or third party. Agent further consents to the disclosure by WFG of such information to any Product Provider to which Agent desires to get appointed.

_______ INITIALS 6.12 As a condition to becoming an Agent of WFG, the Agent is not required to purchase any of the Products and Services and is not required to pay WFG or the Product Providers any consideration for not purchasing a Product or Service. Further, in order to purchase any Products and Services, the Agent is not required to be affiliated with WFG, Affiliated Companies or the Product Providers.

6.13 Agent irrevocably consents to and forever authorizes the use by WFG or anyone authorized by WFG, its legal representatives or assigns, the absolute and unqualified right to use all photographs in which the Agent has appeared for WFG and reproductions thereof, in which the Agent has been included in whole or part, made through any media without inspection or approval of the finished product or use to which it may be applied, in any manner WFG may desire, factually or fictionally, including the right to make adaptations of said material of every and any kind and character. For such purpose, WFG may obtain copyright in all countries on such use by WFG of such material in any form and upon any and all adaptations thereof to renew such copyrights. The Agent releases and discharges WFG, Affiliated Companies, their assigns, agents, or licensees from any and all claims and demands that the Agent may have, which arise out of or in connection with the use of such photographs or reproductions, including but not limited to, any and all claims of libel, slander, and invasion of privacy.

By signing this Agreement, I hereby revoke and terminate any Associate Membership Agreement or Marketing Director Agreement that I previously signed with World Financial Group, Inc., World Marketing Alliance, Inc. or any other predecessor to World Marketing Alliance, Inc., or any previous Agent Agreement with WFG which is still in effect and agree that all such language is superseded by the language herein.

**Agent:**

_______________________________________________

Agent Name

By: _______________________________________________

Agent's Signature

Dated: _______________________________________________

**World Financial Group Insurance Agency, LLC**
**World Financial Group Insurance Agency of Hawaii, Inc.**
**World Financial Group Insurance Agency of Massachusetts, Inc.**
**WFG Insurance Agency of Puerto Rico, Inc.**

**By:** [signature]
Andrew Schaad
Vice President

# EXHIBIT A

## GLBA AND HIPAA BUSINESS ASSOCIATE PROVISIONS

**1. Privacy and Confidentiality Generally.**

1.1 Except to the extent directly required to perform your services under this Agreement, you shall hold in strictest confidence and not disclose to any person or use, at any time, whether during or after the termination of this Agreement, any information that we disclose or make available to you that is confidential or proprietary ("Information"). Without limiting your obligations under the previous sentence, you shall apply at least the same standard of care to protect the confidentiality of the Information as you use to protect your own confidential information. Upon termination of this Agreement, you shall return or securely destroy all Information without retaining any copies and shall provide us with your written and signed certification to that effect. All Information is our sole and exclusive property.

1.2 If you are requested to disclose Information pursuant to a subpoena or lawful order, unless prohibited by law, you shall notify us within 10 days of such request. In any event prior to responding, unless expressly prohibited by law, you shall: (A) advise us of the terms of and circumstances relating to such request, (B) consult with us on the advisability of attempting to resist or narrow such request, and (C) if disclosure of Information is required, furnish only such Information you are legally obligated to disclose and cooperate with us to obtain assurance that the disclosed Information will be held in confidence. You also shall comply with our DP Framework provisions set forth in Exhibit B and any other privacy and security requirements that we have provided to you in writing.

**2. Compliance with GLBA Generally.** With respect to your use and disclosure of Nonpublic Personal Financial Information (as defined below), you shall comply with the requirements of the Gramm-Leach-Bliley Act (15 U.S.C. sec. 6801 et seq.) and state insurance regulations implementing Title V and their respective rules and regulations (collectively "GLBA"). Compliance with GLBA includes, but is not limited to, the DP Framework provisions set forth in Exhibit B and the following:

2.1 You may use or disclose Nonpublic Personal Financial Information only to perform your services under this Agreement, as specifically provided in Section 5.3 below, and as required by law. "Nonpublic Personal Financial Information" means personally identifiable financial information and includes any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any nonpublic personal information; provided, however, that the above definition shall be superseded and replaced to the extent that the definition of Nonpublic Personal Financial Information under GLBA Section 509, subsection (4), as the same may be amended or superseded from time to time, differs from this definition.

2.2 You shall maintain appropriate, but no less than those set forth in Exhibit B, administrative, physical and technical safeguards to prevent prohibited uses or disclosures of Nonpublic Personal Financial Information.

2.3 You shall require that your sub-agents, directors, officers, and employees who have access to Nonpublic Personal Financial Information agree in writing to the same restrictions and conditions that apply to you.

**3. ACE and Business Associate Designations under HIPAA.**

3.1 You acknowledge that WFG and its Affiliated Companies (collectively the "Company"), with respect to the health care components of each Company, (such health care components of a Company shall be referred to as the "Covered Entity" and collectively the "Covered Entities"), have elected to adopt Affiliated Covered Entity ("ACE") status, as defined and permitted under the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health (HITECH) Act, and its implementing regulations set forth at 45 C.F.R. Parts 160 and 164, which include the Privacy, Security, Breach Notification and Enforcement Rules (collectively "HIPAA"), such designation has been appropriately adopted and documented, and any Company is authorized to enter into a Business Associates Agreement on behalf of some or all other members of such ACE. To the extent the HIPAA covered health care component of any such member of the ACE merges with another affiliate or undergoes a corporate name change, this Agreement shall apply to any such merged and/or renamed component/company.

3.2 You further acknowledge that in your provision of services to the Covered Entities you are a "Business Associate" as defined in 45 C.F.R. §160.103 and as a Business Associate you are directly subject to HIPAA, including, but not limited to, its provisions relating to security (45 C.F.R. §§164.308, 164.310, 164.312 and 164.316) and privacy of Protected Health Information as well as its enforcement and penalty provisions.

**4. Compliance with HIPAA.** With respect to your use and disclosure of Protected Health Information (as defined below), you shall comply with the requirements of HIPAA. Compliance with HIPAA includes, but is not limited to, the DP Framework provisions set forth in Exhibit B and the following:

4.1 You shall use or disclose only the minimum necessary amount of Protected Health Information to perform your services and as specifically permitted under this Agreement, for the proper management and administration of your business (other than for cross-marketing and/or cross-selling of other policies or products, which are prohibited except to the extent specifically provided in Section 5.3 below), to carry out your legal responsibilities, or otherwise as required by law. "Protected Health Information" or "PHI" has the same meaning as the term "protected health information" in 45 C.F.R. §160.103 and shall include as appropriate Electronic Protected Health information as defined in 45 C.F.R. §160.103, limited to information that you create or that you receive from us or on our behalf, and includes information that relates to the past, present, or future physical or mental health or condition of an Individual, to the provision of health care to an Individual, or to the past, present, or future payment for the provision of health care to an Individual, and that identifies the Individual or for which there is a reasonable basis to believe that the information can be used to identify the Individual, in each case regardless of whether the Individual is living or deceased. By way of illustration only, the following information shall constitute Protected Health Information with respect to an Individual: (A) name, (B) street address, city, county, precinct, and zip code, (C) dates directly related to the Individual, including birth date, admission date, discharge date, and date of death, (D) telephone numbers, fax numbers, and electronic mail addresses, (E) social security number, (F) medical record numbers, (G) health plan beneficiary numbers, (H) account numbers, (I) certificate/license numbers, (J) vehicle identifiers and serial numbers, including license plate numbers, and (K) any other unique identifying numbers, characteristics, or codes. As used herein, an "Individual" includes a customer, Individual, certificate holder, applicant or other individual receiving products or services of or on behalf of the Company

4.2 You may not use or disclose Protected Health Information in any manner that would constitute a violation of HIPAA if we used or disclosed the information in the same manner.

4.3 You may not aggregate or de-identify Protected Health Information without obtaining Covered Entity's prior express written permission.

4.4 You shall comply with our request to accommodate an Individual's access to his or her Protected Health Information as provided by 45 C.F.R. §164.524.

4.5 You shall comply with our request to amend Protected Health Information in accordance with an Individual's request as provided by 45 C.F.R. § 164.526.

4.6 You shall keep an accounting of disclosures of or access to Protected Health Information that must be provided under 45 C.F.R. § 164.528 to an individual to whom the Protected Health Information relates. You shall comply with any request that we make to provide us with information pertaining to such disclosures or access in such format as we reasonably may request. Such provided information shall include the content as required under HIPAA.

4.7 You shall make your internal practices, books, and records relating to uses and disclosures of Protected Health Information available to us (or to our designee) and to the Secretary of the U.S. Department of Health and Human Services (the "Secretary"), or to the Secretary's designee, for the purpose of confirming your compliance and/or our compliance with HIPAA.

4.8 Upon termination of this Agreement, if feasible, you shall return or destroy all Protected Health Information without retaining any copies and shall provide us with your written and signed certification to that effect. If such return or destruction is not feasible, you shall notify us and shall limit all further uses and disclosures to those purposes that make such return or destruction of the Protected Health Information not feasible.

4.9 You shall maintain appropriate, but no less than those set forth in Exhibit B, administrative, physical and technical safeguards to prevent prohibited uses or disclosures, and to protect the confidentiality, integrity and availability, of any Protected Health Information that you create, receive, maintain or transmit. Such safeguards shall include development, implementation, and maintenance of a comprehensive written information security program compliant with applicable laws and designed to: (A) protect the integrity and confidentiality of Protected Health Information, (B) protect against anticipated threats or hazards to the security, confidentiality and/or integrity of Protected Health Information, (C) protect against any unauthorized disclosure or use of Protected Health Information, (D) address computer and network security, (E) address physical security, and (F) provide for the secure disposal and destruction of Protected Health Information.

4.10 You shall ensure that any subcontractors (as defined in 45 C.F.R. § 160.103) that create, receive, maintain, or transmit Protected Health Information on your behalf agree to the same restrictions and conditions that apply to you with respect to such information. You agree to enter into appropriate written agreements outlining these obligations and to obtain satisfactory assurances (as that term is contemplated in HIPAA) of such compliance by all subcontractors. To the extent you make disclosures under 45 C.F.R. § 164.504(e)(4), you will obtain reasonable assurances that PHI will be held in confidence and will not be used or disclosed outside of the intended purpose.

4.11 To the extent that we may require you to carry out Covered Entities' obligations in accordance with the Agreement, under 45 C.F.R. § 164 Subpart E, you will comply with the requirements of that Subpart which apply to covered entities in the performance of such obligations.

4.12 You shall require that your directors, officers, and employees who have access to Protected Health Information agree to the same restrictions and conditions that apply to you with respect to such information.

4.13 You agree that you will (A) comply with all applicable security and privacy provisions of HIPAA; and (B) you will not act in any way to interfere with or hinder the Covered Entities' ability to comply with HIPAA.

4.14 You shall mitigate, to the extent practicable, any harmful effect that is known to you of: (i) a use or disclosure of Protected Health Information by you or your agents or subcontractors, in violation of the requirements of this Agreement, or (ii) any security incident or breach.

4.15 In the event either party learns of a pattern of activity or practice of the other party that constitutes a material breach or violation of its obligations relating to Protected Health Information under the Agreement, the non-breaching party will take reasonable steps to cure the breach or end the violation. If such steps are unsuccessful, the non-breaching party will terminate the Agreement, if feasible, or if termination is not feasible, report the problem to the Secretary. We reserve the right, in our sole discretion, to terminate this Agreement immediately upon notice in the event of any such material breach or security incident.

4.16 You acknowledge and agree to adhere to any limitations on the disclosure, marketing and/or sale of Protected Health Information as required under 45 C.F.R. § 164.508 and/or as otherwise set forth in HIPAA.

4.17 You acknowledge and agree that the Protected Health Information is and shall remain the Covered Entity's property and that you acquire no title or rights to the Protected Health Information as a result of this Agreement.

**5. Miscellaneous and Additional Provisions Relating to Confidentiality Generally, GLBA, and HIPAA.**

5.1 In response to an unsolicited direct Individual inquiry, you may disclose Nonpublic Personal Financial Information and Protected Health Information directly to, and may discuss such information directly with, the Individual to whom such information pertains, provided that such disclosure would not violate HIPAA if we made it.

5.2 We acknowledge that you may have relationships with affinity groups and associations and that, as a result, you may receive information ("Group Member Information") relating to their members (each a "Group Member") that constitutes Nonpublic Personal Financial Information and/or Protected Health Information. You and we agree that a Group Member's Group Member Information shall constitute Nonpublic Personal Financial Information and/or Protected Health Information only from and after the time that a Group Member applies for a Policy.

5.3 You may use Nonpublic Personal Financial Information and/or Protected Health Information for cross-marketing and/or cross-selling of other policies or products to the extent, but only to the extent, that the Individual to whom such information pertains has authorized you specifically in a writing that complies with GLBA and/or HIPAA, as applicable, to do so and such marketing and selling is conducted in adherence with the restrictions on marketing and sale of Nonpublic Personal Financial Information and/or PHI as provided under GLBA and/or HIPAA.

5.4 Any ambiguity in this Agreement shall be resolved in favor of a meaning that permits compliance with GLBA and HIPAA.

5.5 You shall train your employees who have access to Nonpublic Personal Financial Information and/or Protected Health Information and educate them about your obligations and permitted uses and disclosures under this Agreement, GLBA and HIPAA.

5.6 You shall notify the Covered Entity in writing without unreasonable delay and in any event within three (3) business days after becoming aware of a violation of any provision of this Amendment, any breach of confidentiality or of the occurrence of a “security incident” or “breach” as such terms are defined in HIPAA (note however that these terms shall not include trivial incidents that occur on a daily basis, such as scans, pings, or unsuccessful attempts to penetrate computer networks or servers maintained by you). You agree to cooperate fully with us in any violation of any provision of this Amendment, any breach of confidentiality. security incident or breach investigation or resolution and agree that no notifications or communications to any Individual(s), media outlets, State or Federal regulatory authorities, or other third parties regarding the event shall be made without, in each instance, our specific prior written consent.

5.7 You shall comply with all applicable Federal, State and local laws and regulations enacted to protect the privacy of individual personal information.

5.8 We can further amend this Exhibit A without your consent to reflect (i) future amendments of GLBA or HIPAA, (ii) court orders interpreting the application of GLBA or HIPAA, (iii) future enactments of applicable privacy or security laws, or (iv) a material change in our business practices, but any such amendment shall be enforceable against you only after we have notified you.

5.9 Covered Entity shall notify you of any limitation(s) in its notice of privacy practices of Covered Entity in accordance with 45 CFR § 164.520, to the extent that such limitation may affect your use or disclosure of PHI.

5.10 Covered Entity shall notify you of any changes in, or revocation of, permission by an individual to use or disclose PHI, to the extent that such changes may affect your use or disclosure of PHI.

5.11 Covered Entity shall notify you of any restriction to the use or disclosure of PHI that Covered Entity has agreed to in accordance with 45 CFR § 164.522, to the extent that such restriction may affect your use or disclosure of PHI.

5.12 Any reference in this Agreement to a section in the GLBA or HIPAA means the section as in effect or as amended and/or superseded from time to time.

# EXHIBIT B
## DATA PROTECTION FRAMEWORK

This Data Protection Framework ("DP Framework") outlines the obligations between you and WFG and its Affiliated Companies (collectively herein defined as the "Company") the Company as it relates to your Processing of Protected Information under the Agreement to which this DP Framework is attached ("Agreement").

**1. Definitions**. For purposes of this DP Framework:

1.1. *Affiliate* means any legal entity that directly or indirectly controls, is controlled by, or that is under common ownership or control with a party.

1.2. *Applicable DP Law* means any privacy, security, or other related law or regulation (including any amendments or binding subregulatory guidance related thereto) that protects Company information or relates to Processing. Such laws may include, but are not limited to: the California Consumer Privacy Act; the New York Department of Financial Services Cybersecurity Rule; the Health Insurance Portability and Accountability Act of 1996; the Gramm-Leach-Bliley Act; and the Fair Credit Reporting Act. Applicable DP Law includes Mandatory Use Restrictions as defined below.

1.3. *Consumer Request* means any request by an individual with respect to any Personal Information Processed under the Agreement, seeking information or asserting rights available under Applicable DP Laws; such requests include, but are not limited to requests: for opt-outs; for access, portability, or deletion; to identify or provide details regarding information Processed; and all similar requests under Applicable DP Laws.

1.4. *Cybersecurity Event* means any act or attempt, successful or unsuccessful, to gain unauthorized access to, disrupt, or misuse a system containing Protected Information; provided, however, that a Cybersecurity Event will not include trivial and routine incidents such as port scans, pings, and other broadcast attacks, so long as they do not materially affect the confidentiality, availability, or integrity of the system or the Protected Information in the system.

1.5. *Personal Information* means, in addition to any definition under Applicable DP Law, any personally identifiable information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, to any individual or a household, including, but not limited to: name; email address; telephone number; age; date of birth; gender; demographic information; marketing preferences; social security number; alien identification number; credit and debit card numbers; other financial account numbers; application data; credit history; financial information; driver's license number; other unique identifier or authenticator; health insurance or medical information; biometric information; IP addresses; internet or other electronic network activity information; geolocation data; audio, electronic, visual, thermal, olfactory or similar information; professional or employment information; education information; consumer report information; and data about transactions or experiences with the Company or any marketing partner of the Company. The term "individual" for purposes of this definition includes any natural person who has any form or relationship to the Company.

1.6. *Process, Processed* or *Processing* includes any access to, and/or any collection, receipt, use, disclosure, sharing, transmission, disposal, maintenance, or storage of Protected Information under the Agreement.

1.7. *Protected Information* means any Company information Processed by you that is subject to Applicable DP Law, which includes but is not limited to Sensitive Business Information and Personal Information

1.8. *Sensitive Business Information* means the business-related information of the Company that, if tampered with or disclosed without authorization, could cause a material adverse impact on the business, operations, or security of the Company.

1.9. *Services* means any and all services provided by you under the Agreement.

**2. Processing of Protected Information.** The following provisions shall apply to you in the course of performing Services:

2.1. *Use Limitations*. You will only Process Protected Information in accordance with Applicable DP Law and the terms of the Agreement, and this DP Framework.

2.2. *Minimum Necessary*. You will limit your Processing of Protected Information to only the information that is necessary to perform the Services.

2.3. *Access Limitations*. You will limit access to Protected Information to only those individuals who have a need to know such Protected Information to perform the Services. You will instruct all such individuals as to the obligations set forth in this DP Framework and shall be responsible for their compliance thereto.

2.4. *Sale of Protected Information*. You will not sell any Protected Information to any third party. "Sell", for purposes of this Section, is as defined under any Applicable DP Law.

2.5. *Consumer Requests*. You will comply with the "Consumer Requests" provisions of this DP Framework, set forth in Section 3.

2.6. *Use of Subcontractors*. Nothing in this DP Framework modifies any limitation on your use of subcontractors, or any rights for the Company to audit or participate in an audit of your subcontractors, to the extent such rights are present in the Agreement. Wherever you are permitted and use any subcontractors in the performance of the Services, you will require that such subcontractors agree in writing to terms no less stringent than those set forth in this DP Framework. You will further ensure that any such subcontractors who Process Protected Information, regardless of whether the Company permits or authorizes such subcontractor, are bound to equivalent terms. In all situations where you use subcontractors to perform Services involving Protected Information, you will remain responsible for all obligations set forth in this DP Framework and any violations thereof.

2.7. *Disposal of Protected Information*. You will, upon termination of the Agreement or as otherwise provided in this DP Framework, securely return or destroy all records, electronic or otherwise, containing any Protected Information. Disposal may be achieved, at the Company's option, through delivery all copies of such records to the Company or through destruction in a manner that renders the records unreadable and undecipherable by any means consistent with Applicable DP Law. Upon the Company's request, you will provide written confirmation of the disposal of Protected Information consistent with this Section.

2.8. *Notification of Legal Requests for Protected Information*. You shall notify the Company as soon as reasonably practicable upon receipt of a lawful legal order or process compelling the disclosure of Protected Information to any governmental authority or other third party. You will not disclose Protected Information in response to a lawful legal order or process (a "Production Request") without providing the Company at least forty-eight (48) hours following your notice to enable the Company to exercise such rights as it may have under applicable law to prevent or limit such disclosure. You shall exercise commercially reasonable efforts to prevent and limit any such disclosure and to otherwise preserve the confidentiality of the Protected Information and will cooperate with the Company with respect to any action taken with respect to such Production Request, including to obtain an appropriate protective order or other reliable assurance that confidential treatment will be afforded to the Protected Information. Notwithstanding the foregoing, you will be excused from complying with this Section to the extent expressly prohibited by applicable law.

2.9. *Mandatory Use Restrictions*. If and to the extent the Company is currently or subsequently designated under any Applicable DP Law or other applicable law as a controller, processor, fiduciary, data fiduciary or is otherwise mandated to impose limitations on the use or Processing of Protected Information ("Mandatory Use Restrictions"), the Company shall inform you of such designation and such Mandatory Use Restrictions in writing and you shall be bound by and shall follow all such Mandatory Use Restrictions as specified by the Company as amended from time to time.

**3. Consumer Requests.** The following applies to Consumer Requests:

3.1. If, on or after January 1, 2020, you receive one or more inquiries regarding the submission of a Consumer Request pertaining to any Personal Information Processed, the parties agree that you shall, at no additional cost, contemporaneously direct the inquiring party to both the Company's dedicated toll-free number of 1-877-247-2401 and website

(www.transamerica.com) in order to allow the individual to begin the Consumer Request submission process. Further, you shall direct any individual who has already submitted a Consumer Request to the Company's dedicated toll-free number of 1-877-247-2401 and website, www.transamerica.com in order to allow the individual to follow-up directly with the Company on the status of the submitted Consumer Request.

3.2. Where you receive a complaint related to the Personal Information Processed, including, but not limited to, allegations that the Processing infringes on an individual's rights under Applicable DP Law ("Processing Complaint"), you will promptly (and in all cases within two (2) business days of receipt), notify the Company of such a Processing Complaint in writing, unless such notices specifically prohibited by Applicable DP Law.

3.3. You will at no additional cost: (a) assist the Company in timely responding to any Consumer Requests or Processing Complaints and reasonably cooperate and facilitate the Company's timely authentication, recording, investigation, processing, execution, and resolution of all such Consumer Requests and Processing Complaints, as well as authenticating the consumer, where appropriate; and (b) securely provide any information requested by the Company that is reasonably responsive to a Consumer Request as soon as reasonably practicable, but in all cases within five (5) business days.

3.4. In the event you receive a request that is not a Consumer Request (i.e., it does not relate to the Personal Information Processed), the parties agree that such request will be subject to your own internal business practices and is not subject to the terms of this DP Framework.

**4. Information Security Requirements.** You will comply with the following cybersecurity requirements where you Process any Protected Information:

4.1. *Risk Assessment*. You agree to furnish all information reasonably requested by the Company in order to conduct an assessment of your data security risks. Such information may include a comprehensive information security questionnaire ("Questionnaire"), excerpts of relevant information security policies describing components of your Cybersecurity Program, and/or any other information agreed upon by the parties. The Company agrees to limit its requests for a Questionnaire to no more frequently than once per calendar year, provided that the Company may request additional relevant information at any time, and the Company may request a new or updated Questionnaire in response to a Cybersecurity Event experienced by you and/or the identification of any practices that materially deviate from information previously submitted by you. The Company may request reasonable additional information as it determines, in its own reasonable discretion, that it requires in order to conduct appropriate oversight of you, as required by applicable law. You will promptly and fully respond to such requests.

4.2. *Minimum Cybersecurity Requirements ("Requirements")*. With respect to any information technology systems involved in the Processing of Protected Information, you represent and warrants that you will at all times have and maintain an information security program (the "Cybersecurity Program") containing administrative, technical, and physical safeguards designed to ensure the security of Protected Information. Such Cybersecurity Program will be based upon and substantially consistent with industry-accepted cybersecurity principles and practices, and shall, at a minimum, incorporate the minimum requirements as noted in your contract applicable to the Services; provided, however, that the Company may impose requirements above the stated minimums based on your information security controls and related matters. In addition to those minimum requirements, you shall perform the following:

4.2.1. *Encryption at Rest*. Any Protected Information stored in your internal systems and devices must be encrypted using then-current and appropriately secure encryption algorithms, tools, and techniques.

4.2.2. *Cybersecurity Event Response*. You will provide notice to Company as soon as reasonably practicable, but in any event within forty-eight (48) hours, following identification of a Cybersecurity Event to shtaisoinformationse@transamerica.com. Such notice will include information reasonably sufficient to allow the Company to meet its own breach notification obligations under Applicable DP Law, to the extent such information is then available, and will at a minimum describe the nature and scope of the Cybersecurity Event and any Protected Information involved in the Cybersecurity Event. If any such information is not available as of the initial notice, you will furnish such information promptly upon obtaining it. You agree to provide additional information related to the Cybersecurity Event where reasonably requested by the Company. Following such notice to the Company, you will take such steps as reasonably necessary to contain, investigate, mitigate, and remediate any Cybersecurity

Event affecting Company information technology systems and/or Protected Information, including remediation of any underlying failures or vulnerabilities. Where the Company determines in its sole discretion that it is necessary to participate in the investigation of a Cybersecurity Event, you will reasonably cooperate with the Company in such investigation. You agree to furnish artifacts evidencing your remediation of all underlying failures and/or vulnerabilities identified in a Cybersecurity Event and you agree that the confidentiality obligations of the Agreement are satisfactory to the sharing of the artifacts and other materials shared with respect to the Cybersecurity Event and your remediation.

4.2.3. *Subcontractor Requirements and Oversight.* Your Cybersecurity Program will include oversight by you of your subcontractors and their compliance with the applicable requirements of your Cybersecurity Program wherever the Processing of Protected Information occurs. You will require that such subcontractors agree in writing to cybersecurity requirements no less stringent than the Requirements.

4.3. *Alternate Controls.* Where the parties reasonably agree that any Requirement is unduly onerous in light of the Services provided and the risks to Protected Information, the parties will work together in good faith to determine whether appropriate alternative compensating controls may be used to meet the spirit and goals of the Requirements, or if a Requirement may be waived entirely, provided that in all cases, use of alternative compensating controls and/or any waiver of a Requirement is subject to the Company's sole discretion and any conditions thereon imposed by the Company.

4.4. *Audit.* Unless and to the extent otherwise agreed in the Agreement, you agree to permit the Company to conduct reasonable cybersecurity audits on you, within reasonable business hours and upon reasonable advance written notice, to confirm your compliance with this DP Framework. Cybersecurity audits by the Company will be limited to no more frequently than once per calendar year, provided that the Company may conduct additional targeted audits ("Targeted Audits") in response to (a) a Cybersecurity Event, (b) any identified material deviation from your Cybersecurity Program, a Requirement, or an agreed-upon alternative compensating control, or (c) any other material inaccuracy or misrepresentation about the controls and/or underlying risks applicable to Protected Information made by you. Each party will bear its own costs with respect to such audits, except for Targeted Audits, in which cases you will reimburse the Company for its reasonable, direct, out-of-pocket costs incurred in the course of the audit.

4.5. *SOC 2 Type II Reports*. Where available, you will furnish a copy of a current System and Organizations Controls 2, Type II report (Report on Controls at a Service Organization Relevant to Security, Availability, Processing Integrity, Confidentiality or Privacy) or equivalent direct successor report (a "SOC 2 Type II"), including a description of the trust services criteria or principles assessed and any scope limitation under such report. Subject to the Company's reasonable review and acceptance of your submitted SOC 2 Type II report, the Company's audit right under this DP Framework will be deemed satisfied by the SOC 2 Type II report, but only with respect to those controls assessed within the defined scope of the report. The Company may also, at its sole option, agree to accept an alternative third-party assessment or certification of your Cybersecurity Program, such as a PCI-DSS Attestation of Compliance or HITRUST certification, in lieu of exercising its right (or some portion of that right) to audit.

**5. General Provisions.**

5.1. *Effect on Agreement*. The requirements of this Framework are in addition to, and supplement, any terms set forth in the Agreement with respect to the subject matter hereof except to the extent such terms contained are less stringent than set forth herein. To the extent of a conflict between this DP Framework and the Agreement, the standard that is most protective of Protected Information shall control. This DP Framework shall not supersede or replace any HIPAA business associate contract between the parties. All other terms and conditions of the Agreement shall remain in full force and effect. All attachments referenced herein or attached hereto are incorporated herein in full by this reference.

5.2. *Compliance with Law.* Each party to this DP Framework agrees to comply with all applicable law, including Applicable DP Laws. No party hereunder may request any other party to use or disclose Protected Information in a manner that violates such laws.

5.3. *Injunctive Relief*. You acknowledge that a breach of this DP Framework will cause the Company irreparable harm without an adequate remedy at law, and that the Company is entitled to seek injunctive relief to prevent or limit the effect of any such breach.

5.4. *Your Express Certification and Agreement*. By executing the Agreement to which this DP Framework is attached, you certify that you understand and agree to the provisions set forth in this DP Framework will comply with the terms hereof.

WFG

# A Summary of Your Rights Under the Fair Credit Reporting Act

*Para información en español, visite www.consumerfinance.gov/learnmore o escribe a la Consumer Financial Protection Bureau, 1700 G Street NW, Washington, DC 20552.*

The federal Fair Credit Reporting Act (FCRA) promotes the accuracy, fairness, and privacy of information in the files of consumer reporting agencies. There are many types of consumer reporting agencies, including credit bureaus and specialty agencies (such as agencies that sell information about check writing histories, medical records, and rental history records). Here is a summary of your major rights under FCRA. **For more information, including information about additional rights, go to** www.consumerfinance.gov/learnmore **or write to: Consumer Financial Protection Bureau, 1700 G Street NW, Washington, DC 20552.**

- **You must be told if information in your file has been used against you.** Anyone who uses a credit report or another type of consumer report to deny your application for credit, insurance, or employment – or to take another adverse action against you – must tell you, and must give you the name, address, and phone number of the agency that provided the information.

- **You have the right to know what is in your file.** You may request and obtain all the information about you in the files of a consumer reporting agency (your "file disclosure"). You will be required to provide proper identification, which may include your Social Security number. In many cases, the disclosure will be free. You are entitled to a free file disclosure if:

  - a person has taken adverse action against you because of information in your credit report;
  - you are the victim of identity theft and place a fraud alert in your file;
  - your file contains inaccurate information as a result of fraud;
  - you are on public assistance;
  - you are unemployed but expect to apply for employment within 60 days.

  In addition, all consumers are entitled to one free disclosure every 12 months upon request from each nationwide credit bureau and from nationwide specialty consumer reporting agencies. See www.consumerfinance.gov/learnmore for additional information.

- **You have the right to ask for a credit score.** Credit scores are numerical summaries of your credit-worthiness based on information from credit bureaus. You may request a credit score from consumer reporting agencies that create scores or distribute scores used in residential real property loans, but you will have to pay for it. In some mortgage transactions, you will receive credit score information for free from the mortgage lender.

- **You have the right to dispute incomplete or inaccurate information.** If you identify information in your file that is incomplete or inaccurate, and report it to the consumer reporting agency, the agency must investigate unless your dispute is frivolous. See www.consumerfinance.gov/learnmore for an explanation of dispute procedures.

- **Consumer reporting agencies must correct or delete inaccurate, incomplete, or unverifiable information.** Inaccurate, incomplete, or unverifiable information must be removed or corrected, usually within 30 days. However, a consumer reporting agency may continue to report information it has verified as accurate.